TJS:JMS
F. #2016R00133

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

MARTIN TESHER,
               Defendant.

- - - - - - - - - - - X

17 M 504

TO BE FILED
UNDER SEAL

COMPLAINT &
AFFIDAVIT IN
SUPPORT OF
AN ARREST
WARRANT AND A
SEARCH WARRANT

(21 U.S.C. § 841(a)(1))

EASTERN DISTRICT OF NEW YORK, SS:

      MICHELLE O'TOOLE, being duly sworn, deposes and states that she is a Special Agent with the Drug Enforcement Administration, duly appointed according to law and acting as such.

      On or about and between January 1, 2017 and March 1, 2017, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant MARTIN TESHER did knowingly and intentionally, and without authorization, distribute controlled substances, which offenses involved substances containing oxycodone, a Schedule II controlled substance.

      (Title 21, United States Code, Section 841(a)(1))

The source of your deponent's information and the grounds for her belief are as follows:[1]

1. I have been a Special Agent with the Drug Enforcement Administration ("DEA") since 2006. I am currently assigned to the Long Island District Office. During my tenure with the DEA, I have participated in numerous investigations involving the illegal distribution of controlled substances, including Oxycodone, by medical professionals outside the usual course of professional practice and not for a legitimate medical purpose. I have participated in the execution of numerous search warrants of premises in connection with drug trafficking investigations.

2. I am familiar with the facts and circumstances set forth below from my participation in the investigation, my review of the investigative file and my discussions with and review of reports from other law enforcement officers involved in the investigation. I have also conferred with a medical doctor who is a pain management specialist (the "Pain Management Specialist") about this investigation.

3. I am participating in an investigation of the defendants MARTIN TESHER, a medical doctor and a nurse practitioner, respectively. TESHER specializes in family medicine, as a General Practitioner. This investigation revealed that TESHER illegally distributed thousands of prescriptions for Schedule II controlled substances outside the usual course of professional practice and not for a legitimate medical purpose.

---

[1] Because the purpose of this Complaint and Affidavit is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

## THE DISTRIBUTION OF CONTROLLED SUBSTANCES GENERALLY

4. The Controlled Substances Act ("CSA"), 21 U.S.C. §§ 801 et seq., and regulations promulgated thereunder, classify controlled substances in five schedules. Schedule I controlled substances, including, for example, heroin and LSD, do not have an acceptable medical use in the United States. Schedule II through Schedule V controlled substances have acceptable medical uses. The medical use of Schedule II controlled substances, including oxycodone and hydrocodone, is severely restricted because such drugs have a high abuse potential. Schedule III controlled substances have an abuse potential less than those in Schedule II, but more than Schedule IV controlled substances, and so forth. Schedule V controlled substances consist primarily of preparations containing limited quantities of certain narcotics and stimulant drugs.

5. Pursuant to Title 21, C.F.R. §§ 1306.11(a) and 1306.21(a), a controlled substance listed in Schedules II, III, IV or V, that is a prescription drug, as determined under the Food, Drug & Cosmetics Act, 21 U.S.C. §§ 301 et seq., may be dispensed only if prescribed by an authorized practitioner. Schedule II controlled substances require a written prescription which must be manually signed by the practitioner or an electronic prescription that meets all DEA requirements for electronic prescriptions for controlled substances.

6. The CSA scheduling system is supplemented by the individual states according to local needs and conditions. In New York State, a physician must prescribe Schedule II drugs via an official New York State prescription. Information concerning transactions involving Schedule II drugs is transmitted to state authorities via computer when the drugs are dispensed by a pharmacist.

7.      In addition to the requirements imposed by New York State, physicians must obtain and maintain a registration with the DEA authorizing them to prescribe all controlled substances, in Schedules in which they are registered, pursuant to 21 C.F.R. § 1306.03.

8.      Title 21, C.F.R. § 1306.04(a) sets forth the purpose of the issuance of a prescription. It says, in pertinent part, in order for "[a] prescription for a controlled substance to be effective, [it] must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner . . . [a]n order purporting to be a prescription issued not in the usual course of professional treatment . . . is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. § 829) and . . . the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances."

9.      Schedule II controlled substance prescriptions are reported and electronically maintained at the New York State, Department of Health, Bureau of Narcotic Enforcement ("BNE"). The disclosure of prescription records caused by the execution of a search warrant is not prohibited by the regulations promulgated under the Health Insurance Portability and Accountability Act of 1996, commonly referred to as "HIPAA," P.L. 104-191, which permit the disclosure of medical records pursuant to a court-ordered warrant. See 45 C.F.R. § 164.512(f)(1)(ii)(A).

10.     Written prescriptions by physicians are written on what is commonly referred to as a "prescription pad." A doctor licensed by the State of New York and

registered by the DEA to write controlled substance prescriptions may order pre-printed prescription pads from New York State. Each pad contains 100 prescriptions with a serial number, the doctor's name, a bar code, the doctor's license number, and the address used by the doctor on his or her DEA registration and his or her registration number. The doctor issuing the prescription must fill in, among other things, the patient's full name and address, the drug name, strength, dosage form, quantity dispensed, and directions for use. The New York State Department of Health has mandated that all prescriptions be filed electronically via Electronic Prescribing, commonly referred to as "e-scribing", unless a doctor has been granted a waiver for a limited list of reasons, for a limited period of time. This mandate has been in effect since August 31, 2016.

11.     On October 17, 2000, Congress passed the Drug Addiction Treatment Act (DATA) which permits qualified physicians to treat narcotic dependence with Schedules III, IV and V narcotic controlled substances that have been approved by the Food and Drug Administration for that indication. Physicians registered with the DEA as practitioners who apply and are qualified pursuant to DATA are issued a waiver and will be authorized to conduct maintenance and detoxification treatment using specifically approved Schedule III, IV, or V narcotic medications, including suboxone. DATA waived physicians may treat 30 or 100 patients at any one time, dependent on individual authorization from the Center for Substance Abuse Treatment. Additional reference is made to Title 21, C.F.R. § 1306.04(b) which sets forth guidance regarding the purpose of the issuance of a controlled substance prescription. It states in pertinent part, "A prescription may not be issued for "detoxification

treatment" or "maintenance treatment," unless the prescription is for a Schedule II, IV or V narcotic drug approved by the Food and Drug Administration."

12. Oxycodone is a semi-synthetic opioid analgesic medication classified as a Schedule II controlled substance that is generally prescribed for the relief of moderate to severe pain. Oxycodone is available in time-release oral pill formulation, as well as in combination with other medications. It has a serious potential for abuse. Drug abusers crush the protective time-release coating on the pill and, snort, ingest or inject it, thereby obtaining all of the drug at one time. Oxycodone used in this fashion produces a heroin-like euphoria. It is a highly addictive drug. As noted above, physicians, including those in the DATA waived program, are not authorized to prescribe Schedule II narcotics to treat addiction.

## PROBABLE CAUSE

13. In or about December 2015, the DEA began an investigation into the defendant MARTIN TESHER's practices after receiving information from a confidential informant (the "CI")[2] that the CI had seen TESHER as a patient, and TESHER was overprescribing oxycodone when it was not medically necessary. TESHER is a DATA waived physician, authorized to prescribe Schedule III, IV or V prescriptions for addiction to up to 30 patients.

---

[2] The CI was arrested on a probation violation in the Eastern District of New York and was providing information in the hopes of cooperating with the government or receiving leniency. He was not signed up as a formal cooperator due to another probation violation. The information provided by the CI was corroborated with other evidence and proven to be accurate.

14. As part of its investigation, the DEA obtained records from the BNE for prescriptions written by defendant MARTIN TESHER and filled between June 2012 and January 2017. In that period, TESHER wrote more than 14,000 oxycodone prescriptions totaling over 2,247,000 pills, a disproportionately high number for a General Practitioner who maintains a family practice. TESHER does not have any specialized training in pain management.

15. Between 2015 and present, the DEA has obtained multiple copies of medical records from MARTIN TESHER's medical practice through a Grand Jury Subpoena of records originally obtained by the New York State Office of Professional Medical Conduct (OPMC). The DEA also interviewed several of TESHER's former patients. Furthermore, the DEA has consulted with a doctor who is a pain management specialist about proper use of opioid controlled substances.

16. A review of evidence obtained during the course of the DEA investigation revealed that defendant MARTIN TESHER prescribed Schedule II controlled substances on a continuing basis to patients without a legitimate medical purpose after learning or having reason to believe that these patients: (a) were or had been in treatment for substance abuse and/or received medication to treat opioid addiction, (b) had suffered non-fatal prescription drug overdoses, (c) abused illicit drugs such as cocaine and heroin, (d) sold or otherwise diverted their own medication or used medication prescribed to someone else, (e) tested positive for illicit substances such as cocaine, heroin and un-prescribed pain medication, and/or (e) were engaged in doctor shopping. In some cases, TESHER's own statements indicated he knew that certain patients were addicted to their prescribed

medication (i.e. oxycodone), yet the defendant continued prescribing the patients with Schedule II opioids, as opposed to prescribing these patients with Schedule III, IV or IV medications as part of his DATA waiver program. TESHER did not prescribe these patients with Schedule III or IV narcotics as part of his DATA waiver program. TESHER's willingness to provide prescriptions for such patients without legitimate medical purpose or proper addiction treatment evidences of his illicit activity.

Confidential Informant

17.     For example, my review of the evidence gathered to date indicates that the CI, a former TESHER patient, whose identity is known to the government received prescriptions for controlled substances from defendant TESHER. The CI indicated that the CI had seen TESHER on approximately 15 occasions. The CI indicated that the CI showed TESHER a scar from a previous surgery and told TESHER the CI was taking 30 milligram oxycodone that the CI was receiving from a family member. TESHER wrote a prescription for 240 30 milligram oxycodone pills. TESHER continued to prescribe oxycodone to the CI at each subsequent appointment. After TESHER learned the CI had been charged with a crime, TESHER provided the CI with a prescription for 150 pills. TESHER remarked that he wanted to lower the CI's pill prescription but the CI would indicate that the CI was not ready and TESHER would continue to prescribe. The lowest amount of oxycodone prescribed by TESHER to the CI was 120 oxycodone pills. During this time, some pharmacies refused to fill the prescriptions as they were written. TESHER never offered the CI physical therapy for pain or suboxone or other Schedule III, IV or V drugs for oxycodone addiction.

Confidential Informant 2

18. Another confidential informant ("CI2")[3] received prescriptions for controlled substances from defendant MARTIN TESHER. In January 2017, CI2 set up an appointment to see TESHER. On the first appointment, while CI2 was in the waiting room, an unidentified male patient told CI2 that he was getting 600 pills per month (used to get 800 pills per month) and was selling them for $35 per pill on the street. The male patient told CI2 to tell the doctor that CI2 was taking a lot of pills and buying them off the street, in order to get prescribed a lot of pills.

19. CI2 met with a nurse and indicated that CI2 was taking 15-20 pills of prescription narcotics a day, minimum, sometimes up to 30 pills per day. CI2 indicated that CI2 had general pain from construction work. The nurse asked CI2 how CI2 learned about TESHER's "program." The nurse indicated there were a lot of rules CI2 would have to follow because oxycodone is very addictive – worse than heroin. After discussing CI2's physical health and weight, TESHER indicated to CI2 that TESHER believed CI2 had an "addiction" problem, and prescribed oxycodone at the appointment anyway. TESHER indicated that the most he could prescribe CI2 is 15 oxycodone pills per day (which would be 450 for a 30 day supply). TESHER prescribed 450 30 milligram oxycodone pills to CI2, as well as several other medications, to be used over one month. The oxycodone prescriptions

---

[3] CI2 was a confidential source working with the New York City Police Department (the "NYPD"); CI2 indicated that CI2 had information about TESHER. (CI2 previously faced narcotics charges in New York State during which time CI2 became an informant with the NYPD; after the charges were resolved, CI2 continued to work as a paid informant with the NYPD.) CI2 is not currently facing any criminal charges; CI2 is working as a paid informant for this investigation. CI2's information has proven accurate and reliable and has been corroborated by other information.

instructed CI2 to take a maximum of three tabs, five times per day.  TESHER informed CI2 to return to his office in one month for the next appointment.

20.     CI2 attended a second appointment at MARTIN TESHER's practice in February 2017.  CI2 had been instructed to bring back the empty pill bottles from the first prescriptions; CI2 did not.  CI2 was drug tested to determine whether CI2 was taking the prescribed oxycodone, and CI2 tested negative for the presence of the drug.  CI2 explained to TESHER's nurse practitioner that CI2 had run out early because CI2 was taking more than prescribed.  That day, TESHER prescribed 390 30 milligram pills of oxycodone to CI2.  TESHER never verified that CI2 has any injury via medical test or prior patient files, and TESHER did not refer CI2 to physical therapy.

21.     I have discussed this with a doctor who specializes in pain management (the "Doctor").  The Doctor indicated that there is no medical reason to prescribe 450 30 milligram pills to a patient on a first appointment without a serious injury or illness and medical proof of the cause of the alleged pain.  The Doctor would require that the patient get an MRI, or provide former medical files or other medical documentation of the source of pain.  The Doctor stated that no legitimate licensed medical doctor would go on to prescribe the maximum amount of daily oxycodone as done by TESHER, particularly after TESHER indicated that he could tell CI2 was seeking oxycodone because of addiction.  The Doctor indicated that, in the second appointment, red flags include previous knowledge of addiction, a negative drug test, lack of corroboration of a legitimate illness or injury, and the violation of TESHER's own Controlled Substance Agreement with CI2 (i.e., CI2 stating to have taken more medication than prescribed and not bringing back prescription bottles as requested).

The Doctor stated there was no legitimate medical reason to continue prescribing CI2 oxycodone on or after the second appointment.

### Other Patients

22.     In March 2017, I interviewed a former TESHER patient, whose identity is known to the government ("Patient #1"). Patient #1 was a patient between 2011 and 2014. Patient #1 told TESHER that Patient #1 was addicted to oxycodone and needed to be weaned off. TESHER prescribed Patient #1 hundreds of oxycodone pills on each visit (along with Xanaz, oxycontin, morphine, opana and other medications) and never prescribed suboxone or addiction treatment. During treatment with TESHER, Patient #1 was drug-testing negative for the prescribed opiates and also positive for a controlled substance that was no prescribed (methadone), as well as cocaine and marijuana. Several times, TESHER permitted a family member to pick up the prescriptions for Patient #1 and Patient #1 did not see TESHER for several months during that time period. Another family member of Patient #1 called TESHER's office to complain about excessive prescribing. TESHER subsequently ceased treating Patient #1, following TESHER writing an additional month's worth of controlled substance prescriptions. The Doctor reviewed Patient #1's patient history and indicated that there was no legitimate medical reason for TESHER to prescribe this quantity of oxycodone.

23.     Between 2010 and 2014, TESHER also treated a patient whose identity is known to the government (Patient #2) with oxycodone. Patient #2 complained of various ailments and injuries such as back pain, a hurt knee, a work injury, and a sports injury. Without conducting physical tests or requiring x-rays be taken, TESHER prescribed Patient #2 hundreds of oxycodone pills per month. Patient #2 did not bring back the oxycodone

bottles as required, claiming at various points that they were stolen from Patient #2's house, stolen by some kids who knocked out Patient #2, stolen from Patient #2's car, lost during travel and so forth. In addition, Patient #2 failed a drug test, and tested positive for methadone, which was not prescribed by TESHER. After each of these reported incidents, TESHER continued to prescribe oxycodone without medical necessity. The Doctor indicated that based on all of these red flags, there was no legitimate medical reason to support TESHER's prescriptions for Patient #2.

24. Patient #3 (a former patient of TESHER whose identity is known to the government) received about 15 prescriptions from TESHER in 2015 and 2016. Prior to seeing TESHER, Patient #3 was seeing a different provider, according to BNE data. That provider wrote Buprenorphine and Naloxone 8 milligram and 2 milligram and Suboxone prescriptions for Patient #3. These are prescriptions for weaning off an oxycodone or heroin addiction. Despite having access to that data, BNE data revealed that TESHER began by prescribing 450 30mg oxycodone pills to Patient #3. At the second appointment, the pill count was nearly cut in half and continued to decrease. However, in April 2016 the pill count more than doubled from 65 pills to 150 pills. TESHER also wrote Patient #3 prescriptions for a 15 day supply, 30 day supply, as well as a 12 day supply, and 24 day supply. Based on my training and experience, I have learned that many pharmacies will not fill prescriptions indicating high number of oxycodone pills - and prescriptions with 15 day supplies, for example, often make it easier for patients to fill a high monthly pill count. The Doctor reviewed Patient #3's prescription history and indicated that TESHER's prescribing methods did not make sense medically , and in addition to other red flags such as past

13

addiction problems, Patient #3 would have had to endured a significant medical event in order to support TESHER's multiple oxycodone prescriptions.

WHEREFORE, your deponent respectfully requests that an arrest warrant be issued for the defendant MARTIN TESHER so that he may be dealt with according to law.

In addition, it is respectfully requested that this affidavit and arrest warrant be filed under seal until further order of the Court. The investigation into the activities of defendant MARTIN TESHER is continuing. Premature disclosure of this affidavit and arrest warrant could jeopardize the investigation and afford the defendant the opportunity to flee from prosecution.

_____
MICHELLE O'TOOLE
Special Agent
Drug Enforcement Administration

Sworn to before me this
2nd day of June, 2017

_____
THE HONORABLE LOIS BLOOM
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK